**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| The Cincinnati Insurance Company,<br><br>       Plaintiff,<br>vs.<br><br>Recreation Centers of Sun City, Inc.,<br><br>       Defendant. | No. CV-07-0329-PHX-PGR<br><br>OPINION and ORDER |

Pending before the Court is Plaintiff's Motion for Partial Summary Judgment (doc. #23) and Defendant/Counterclaimant RCSC's Cross-Motion for Summary Judgment on Coverage/Breach of Contract (doc. #75).  Having considered the parties' memoranda in light of the admissible evidence of record and the oral argument of counsel, the Court finds that plaintiff Cincinnati Insurance Complaint's motion should be denied in its entirety and that defendant Recreation Centers of Sun City, Inc.'s cross-motion should be granted in part.

Background

This diversity-based declaratory judgment action arises from the denial of insurance coverage for the partial collapse of the roof over the indoor swimming pool and spa area of the Sun Dial Recreation Center that occurred on June 19, 2006.  The center is owned by Recreation Centers of Sun City, Inc. ("RCSC")

and was then insured by Cincinnati Insurance.  Cincinnati Insurance denied RCSC's claim on February 12, 2007, and then filed this declaratory judgment action the same day.  The complaint seeks a declaration that Cincinnati Insurance owes RCSC nothing under the insurance policy under five different theories of exclusion: hidden or latent defect (First Claim); negligent work (Second Claim); collapse (Third Claim); lack of fortuity (Fourth Claim); and pre-existing loss (Fifth Claim).  The complaint alternatively requests that if the Court finds that coverage exists under the policy that the Court order the parties to resolve the issue of the value of the claim through the required appraisal provisions of the insurance contract (Sixth Claim).  In response, RCSC filed counterclaims for breach of contract (Count I), and bad faith (Count II).  Cincinnati Insurance's pending motion seeks summary judgment regarding the first three claims of its complaint and on RCSC's counterclaim for breach of contract; RCSC's cross-motion seeks summary judgment on the issue of coverage and breach of contract.

The recreation center was built in 1972.  As originally built, the roof over the enclosed swimming pool area was composed of wood structural panel sheathing over open web wood trusses.  The wood trusses were supported by tapered glued laminated ("glulam") wood beams.  The two main glulam support beams, both 120' long, free-spanned the pool area some 30' above the floor. The roof support structure was hidden from view by a dropped acoustical ceiling.

RCSC had the roof reconstructed in 1987 because high moisture conditions over the pool caused corrosion in the steel pin connectors in the wood trusses and wood decay in the trusses.  The roof sheathing and trusses were removed and were replaced by a new superstructure of glulam beams and

tongue and groove wood decking.  The two original major glulam support beams remained in place after being found to be structurally sound.  RCSC added two spas to the pool area in a 2001 remodeling project.  In 2006, approximately half of the roof, some 9,000 square feet, collapsed into a swimming pool when one of the original main glulam support beams fractured near midspan.

Experts' Conclusions

Cincinnati Insurance's main expert, Marc Sokol, a professional engineer, issued a report, dated January 5, 2007, of his findings regarding the reasons for the roof collapse; the report summarized Sokol's conclusions as follows:

> 1. The partial roof collapse originated near midspan of a glued laminated wood beam that spanned across the south end of the pool. The cause of the collapse was a combination of material defects in the tension laminations of the beam near midspan, including:
>    a. Reaction Wood.
>    b. Glue skip between tension laminations.
>    c. Close spacing of lamination finger joints adjacent to the areas of glue skip.
>    d. Plane snipe.
> 2. The partial roof collapse is not attributable to the following:
>    a. Overload of the roof (assuming the attic ventilation system was operating properly).
>    b. Weather events.
>    c. Work performed by a roofing contractor approximately 1 week prior to the collapse.
>    d. Fungal deterioration (rot).
>    e. Termite or similar degradation.
>    f. Changes to the roof structure that occurred during a renovation in approximately 1987, including changes in the dead load of the roof and changes in how the beam was laterally supported.
>    g. Material or workmanship defects in the stub columns.

RCSC's main expert, Bryan River, an expert in wood science, issued a report, dated August 21, 2007, of his findings regarding the reasons for the collapse; his report summarized his findings as follows:

> [F]ailure of this [glulam support] beam was initiated by degradation of the finger joint adhesive, and consequent fracture of a critical finger

joint in the region of the main bending failure.

The adhesive used to bond the finger joints is susceptible to strength degradation by heat and moisture in a warm humid service environment and stress.  Degraded adhesive is shown by the macroscopic appearance of many failed finger joints and, microscopic inspection of the adhesive in failed finger joint surfaces.

The manufacturing processes of the finger jointing and laminating were not good.  This is seen in the frequency of laminate joints with low wood failure, or no deep wood failure, and with partial bonds or complete voids that are concentrated in the main bending failure, but which also occur throughout the beam.

A majority of limber pieces used in the critical tension laminations in the main bending failure were below grade in density and percent latewood.

Frequent poor to void laminate joints, below grade lumber in the outer tension laminae, and increased load all reduced the margin of safety designed in the beam and contributed to its catastrophic collapse, but time dependent degradation was the ultimate cause for failure of this beam.[1]

Relevant Provisions of the Insurance Policy

The commercial and personal property insurance policy at issue, no. CPP 074 40 66, which was effective between June 30, 2003 and June 30, 2006, provided in relevant part as follows:

    Section A.  Coverage
    * * *
    3. Covered Causes of Loss
    * * *
    b. Exclusions

---

[1] While the report of Cincinnati Insurance's main expert, Marc Sokol, did not address the question of degradation of the adhesive due to long term exposure to moisture and heat, Cincinnati Insurance's wood expert, John J. Janowiak, Ph.D., stated in a letter to Cincinnati Insurance's counsel that he was in "general agreement with no major conflict" regarding the conclusions Bryan River reached in his report to RCSC regarding the cause of the collapse.  Sokol stated at his deposition that based on Janowiak's review of River's report that he (Sokol) could not conclusively rule out long-term degradation of the finger joint adhesive as a causative factor of the collapse.

```
                    * * *
        (2) We will not pay for "loss" caused by or resulting from
            any of the following:
                    * * *
            (d) Miscellaneous Causes of Loss
                    * * *
                2) Rust, corrosion, fungus, decay, deterioration,
                    hidden or latent defect or any quality in property
                    that causes it to damage or destroy itself.
                    * * *
            (k) Collapse
                    Collapse, except to the extent provided in
                    5. Coverage Extensions, c. Collapse. However,
                    if collapse results in a Covered Cause of Loss
                    at the "premises", we will pay for that portion of
                    the "loss" caused by that Covered Cause of Loss.
                    * * *
        (3) We will not pay for "loss" caused by or resulting from any
            of the following: (3)(a) through (3)(c).  However, if an
            excluded cause of loss that is listed in (3)(a) through (3)(c)
            results in a Covered Cause of Loss, we will pay for that
            portion of the "loss" caused by that Covered Cause of Loss.
                    * * *
            (c) Negligent Work
                    Faulty, inadequate, or defective:
                    * * *
                (3) Materials used in repair, construction, renovation
                    or remodeling; ...
                of part or all of any property on or off the "premises".
                    * * *
5. Coverage Extensions
    * * *
c. Collapse
    * * *
    (2) We will pay for "loss" to Covered Property, caused by
        collapse of a building or any part of a building insured
        under this Coverage Form, if the collapse is caused by
        one or more of the following:
            * * *
        (b) Decay that is hidden from view, unless the
            presence of such decay is known or should
            reasonably have been known to an insured
            prior to collapse;
            * * *
        (f) ... However, if the collapse occurs after
            construction, remodeling, or renovation is
            complete and is caused in part by a cause
            of "loss" listed in (2)(a) through 2(e) of this
            Coverage Extension, we will pay for "loss"
            even if the use of defective material or methods,
```

in construction, remodeling or renovation,
contributes to the collapse.

Cincinnati Insurance's Denial Letter

Cincinnati Insurance denied RCSC's claim on February 12, 2007. The denial letter, which was signed by Nancy Davis, a senior claims representative, stated in relevant part:

> Pursuant to the express provisions, conditions, and limitations in the applicable policy of insurance, Cincinnati Insurance "will not pay for 'loss' caused directly or indirectly by * * *hidden or latent defect or any quality of property that causes it to damage or destroy itself; [or] * * * faulty and inadequate or defective * * * materials used in repair, construction, renovation or remodeling." Based on Cincinnati's investigation and the independent engineering report, the glulam beam that failed, did so because of certain hidden or latent defects - reaction wood, glue skip between tension laminations, close spacing of lamination finger joints, and plane snipe - in the beam that caused it to collapse on itself, which is an excluded cause of loss. It is also our understanding that the glulam beam that failed was from the original construction, and then reused during the 1987 repair and/or renovation. In other words, the 1987 renovation contained inadequate or defective materials, which is another excluded cause of loss. Thus, there is also no coverage for this loss because it did not commence during the policy period.
> Moreover, while the loss was most probably a collapse, as defined by the collapse extension, said collapse was not caused by one of the enumerated causes of loss provided in the policy. According to the engineering report, the loss was not caused by overload of the roof, insects, weather vents or rot. It is clear that the collapse was <u>not</u> caused by any other "specific causes of loss defined in the policy," and the collapse itself did not occur during "construction, remodeling, or renovation." Thus, the collapse extension does not provide coverage for this loss.

Discussion

Each side asserts that it is entitled to partial summary judgment on the coverage/breach of contract issue: Cincinnati Insurance contends that RCSC's claimed loss is not covered due to the exclusions for latent or inherent defects and negligent work, and is not a covered loss under the collapse coverage extension; RCSC contends that its loss is covered notwithstanding the exclusions

- 6 -

relied on by Cincinnati Insurance due to the collapse coverage extension for hidden decay. The Court agrees with RCSC.

Under the governing Arizona law, the insured bears the burden of establishing that coverage exists under an insuring clause, which includes coverage resulting from an exception to an exclusionary clause, and the insurer bears the burden of establishing the applicability of any exclusion. Hudnell v. Allstate Ins. Co., 945 P.2d 363, 365 (Ariz.App.1997).

A. Definition of "Decay"

The parties' initial, and main, coverage dispute concerns the definition of the term "decay", which is a term that is nowhere defined in the policy and is one that has not been defined by the Arizona courts in a similar context. Cincinnati Insurance argues that the term should be narrowly defined as pertaining to just organic decay, such as rot or fungus, whereas RCSC argues that the term should be broadly defined so as to include inorganic degradation, such as the breakdown of the adhesive in the glulam beam caused by the heat and moisture of the pool area.

The interpretation of an insurance policy is a question of law properly decided by the Court. Sparks v. Republic Nat'l Life Ins. Co., 647 P.2d 1127, 1132 (Ariz.), *cert. denied*, 459 U.S. 1070 (1982). In construing the term "decay," the Court must determine its plain and ordinary meaning using the viewpoint of someone not trained in law or the insurance business[2], and may not interpret the term so as to defeat RCSC's reasonable expectations of coverage. Samsel v.

---

[2] While there is some disagreement among the parties' experts as to the applicability of the term "decay" to the degradation of the adhesive in the glulam beam, that disagreement is not relevant to the Court's interpretation of the term.

1  Allstate Ins. Co., 59 P.3d 281, 284 (Ariz.2002).

2  The Court concludes that the term "decay" is ambiguous as it is used in the policy at issue. It is clear that the term is reasonably susceptible of more than one meaning, one that provides coverage and one that excludes coverage, as it is undisputed that there exists both dictionary definitions of "decay" and case law defining similar policy language that support both sides' contrary positions. *Compare e.g.*, Stamm Theatres, Inc. v. Hartford Casualty Ins. Co., 113 Cal.Rptr.2d 300, 306 (Cal.App.2001) (concluding that the broader connotation of "decay" as the gradual deterioration in strength and soundness is an ordinary meaning of the term, and that so defined the term includes the deterioration of inorganic building materials), and Northeastern Center Inc. v. St. Paul Fire and Marine Ins. Co., 2006 WL 842396, at *5 (N.D.Ind. March 28, 2006) (concluding that decay is not ordinarily understood to mean only rot inasmuch as its definitions include a decline or progressive failure of strength and soundness), *with* Travelers Property Casualty of America v. Eyde Co., 2007 WL 107667, at *6 (W.D.Mich. Jan. 9, 2007) (concluding that the commonplace or plain English meaning of "decay" is not a general, gradual decline in strength but the organic rot or deterioration from a normal state.) Arizona follows the principle of construction that a strong indication of ambiguity is established when various jurisdiction reach different conclusions as to the meaning, intent, and effect of the language in an insurance contract. Fire Ins. Exchange v. Berray, 694 P.2d 259, 262 (Ariz.App.1983), *approved as modified on other grounds,* 694 P.2d 191 (Ariz.1984).

Since the Court concludes that the term "decay" is actually ambiguous, the Court construes it in favor of RCSC. Sparks, 647 P.2d at 1132. The Court thus

accepts the reasoning of such cases as Stamm and Northeastern Center and finds that "decay" is reasonably defined as a gradual deterioration of strength and soundness, and therefore has an inorganic component that would include the degradation of the adhesive in the failed glulam beam. Such a definition is not only within the mainstream connotation of the term, it falls within the purpose of the insurance policy purchased by RCSC, it is consistent with the transaction as a whole, and it accords with public policy considerations.

The Court rejects Cincinnati Insurance's contention that defining "decay" in such a manner conflicts with the general miscellaneous exclusion and negligent work exclusion relied on by Cincinnati Insurance given that a reasonable insured could read the policy and conclude that any collapse covered by hidden decay is covered, even if that decay is caused by an otherwise excluded factor. This is so because the coverage extension for a collapse caused in part by hidden decay trumps the general exclusions.[3]  *See e.g.*, Certain Underwriters at Lloyd's Subscribing to Policy No. WDO-10000 v. KKM, Inc., 215 S.W.3d 486, 494 (Tex.App.2006) (concluding that the coverage extension for collapse caused by hidden decay is a separate provision from the general exclusion for losses caused by "rust, corrosion, fungus, decay, decomposition, hidden or latent defects", and that it extends coverage beyond the carved out exclusions); Jordan v. Allstate Ins. Co., 11 Cal.Rptr.3d 169, 179-80 (Cal.App. 2004) (reconciling a provision extending coverage for a collapse caused by hidden decay with a

---

[3] The exclusion for defective materials used in the construction or remodeling of the insured premises is trumped by the coverage extension for collapse since that provision states that coverage exists for a collapse caused in part by a hidden defect even if the use of defective material in the construction or remodeling of the insured premises contributed to the collapse.

provision excluding coverage for dry rot by concluding that coverage exists for a collapse caused by dry rot even if noncollapse damage caused by dry rot is excluded); Northeastern Center, 2006 WL 842396, at *6 (harmonizing the coverage for collapse caused by hidden decay with the exclusion for losses caused by "deterioration, mold, wet or dry rot, rust or corrosion" by concluding that decay, corrosion, and deterioration, which it determined were synonymous terms, are not covered unless the decay is hidden and causes a collapse.)

While Cincinnati Insurance certainly has the right to draft an insurance policy that limits the term "decay" in the collapse coverage provision to just organic decomposition, it must specifically make that limitation in the policy itself. Sparks, 647 P.2d at 1133 ("If an insurer desires to limit its liability under a policy, it should employ language which clearly and distinctly communicates to the insured the nature of the limitation.") But rather than doing so in the policy at issue, it chose at its peril to leave the term "decay" undefined and unrestricted.[4]

Since Cincinnati Insurance concedes that it is undisputed that some combination of the heat, moisture, and chemicals in the enclosed pool area caused the glulam beam adhesive to degrade, and since the Court construes the term "decay" in the collapse coverage provision of the insurance policy to include inorganic decay, the Court finds as a matter of law that the collapse of the glulam beam was caused at least in significant part by "decay" as that termed in used in the policy's coverage extension for collapse.

---

[4] As RCSC points out, Cincinnati Insurance was put on notice no later than 1997 that there was an interpretation problem with its hidden decay language in the collapse coverage extension provision. *See* Vogel v. Cincinnati Insurance Co., 1997 WL 33284143 (E.D.Wis. Aug. 14, 1997).

B. RCSC's Knowledge of the Hidden Decay

Relying on the policy's provision that collapse caused by hidden decay is covered "unless the presence of such decay is known or should reasonably have been known to an insured prior to collapse[,]" Cincinnati Insurance argues, for the first time in its reply memorandum, that no coverage exists as a matter of law even if the degradation of the glulam beam adhesive amounts to covered decay because RCSC should have known prior to the collapse that the adhesive could and would degrade because of the heat, moisture, and chemicals in the enclosed pool area. The Court disagrees and finds as a matter of law that the decay causing the collapse was hidden from view and was not reasonably known to RCSC prior to the collapse.

As an initial matter, the Court rejects RCSC's contention, raised for the first time in its reply memorandum, that Cincinnati Insurance waived its right to rely on the actual or constructive knowledge portion of the hidden decay provision because Cincinnati Insurance did not rely on it as a ground for denying RCSC's claim. In support, RCSC cites in part to Hagen v. U.S. Fidelity and Guaranty Ins. Co., 675 P.2d 1340 (Ariz.App.1983), wherein the court noted that an insurer has a duty to notify its insured without delay if it wishes to assert its non-liability and that the insurer's "[f]ailure to act promptly may result in a waiver of the right to deny coverage or an estoppel to assert an exclusion."), *opinion approved and adopted,* 675 P.2d 1310 (Ariz.1984).

The Court, however, concludes that this issue is more appropriately governed by D.M.A.F.B. Federal Credit Union v. Employers Mutual Liability Ins. Co. of Wisconsin, 396 P.2d 20, 23 (Ariz.1964), wherein the court, in rejecting the insured's claim that the insurer had waived its right to assert any defense in the

trial court other than the defense to liability it had asserted prior to suit, noted that although the insurer had emphasized one defense prior to suit, it had quoted the full text of the exclusion it relied on at trial to the insured in its first letter to the insured.  As Cincinnati Insurance points out, it expressly reserved the right to rely on the actual or constructive knowledge language in the hidden decay provision (1) by having RCSC's representatives sign a non-waiver agreement on June 20, 2006 that provided that Cincinnati Insurance's investigation of the cause of the loss would not "waive or invalidate any rights whatever of either of the parties", (2) by quoting the "hidden decay" provision policy language in both its reservation of rights letter, dated July 7, 2006, and in its denial letter dated February 12, 2007, and (3) by stating in its denial letter that "[t]he insurance company continues to fully reserve any and all rights and defenses, which may now exist or which may arise in the future.  No waiver or estoppel of any kind is intended nor to be inferred."  Furthermore, Cincinnati Insurance contends, without contravention by RCSC, that it did not become aware of facts supporting the potential application of the actual or constructive knowledge provision until RCSC produced documents in response to discovery requests.  Since Arizona employs the generally accepted definition of waiver of as the intentional relinquishment of a known right, a waiver cannot be implied absent full knowledge of all material facts. Manzanita Park, Inc. v. Ins. Co. of North America, 857 F.2d 549, 555-56 (9th Cir.1988).

     Although Cincinnati Insurance has not waived its right to rely on the knowledge provision, the Court concludes as a matter of law that RCSC has sufficiently established that no reasonable trier of fact could conclude from the evidence presented that RCSC actually knew or reasonably should have known

prior to the collapse of the degradation of the adhesive in the glulam beam that failed.

As for the actual knowledge requirement, Cincinnati Insurance has not cited in its statements of facts to any evidence establishing that any responsible RCSC official actually knew that the adhesive had degraded, whereas RCSC has provided uncontroverted affidavits from Dennis Nichols, RCSC's president, and James Wellman, RCSC's assistant general manager, both of which state that these officials were not aware of any hidden decay in the beams prior to the roof collapse.

As for constructive knowledge requirement, Cincinnati Insurance has not cited to any competent evidence from which the trier of fact could reasonably infer that some responsible RCSC official should have known about the presence of the degraded adhesive. For example, while Cincinnati Insurance relies in large part on a report by PWI Engineers prepared in connection with the 1987 roof reconstruction that stated that the combination of chlorine and moisture could have a deteriorating effect on the integrity of the glulam roof system[5], the trier of fact could not legitimately draw an inference of constructive knowledge by RCSC

---

[5] Only a few pages of the report of the PWI Engineers is part of the record. The portion relied on by Cincinnati Insurance, which is part of the report that is in the record, states:

> Due to the high degree of moisture penetration into the interstitual space, PWI Engineers is concerned about the structural integrity of the GLU-LAM system. The combinations of chlorine and moisture can have a very deteriorating effect on the glue used in this type [of] structural system. Should the structural system be impaired, it would preclude the placement of equipment on the roof. Also, the structural capacity of the roof system to handle additional roof mounted equipment must be evaluated.

- 13 -

from that report because the report was apparently only a pre-inspection report outlining how PWI Engineers was going to inspect the pool enclosure roof, thus making the comment just a pre-investigation general comment; the report stated that PWI Engineers would later issue a report recommending structural/roof systems corrections or limitations and discussing a proposed system design scheme - as RCSC correctly points out, there is no evidence that whatever roof reconstruction design PWI Engineers ultimately recommended was not followed by RCSC.  Furthermore, Cincinnati Insurance has not cited to any evidence of record establishing who at RCSC received the preliminary report.

While Cincinnati Insurance also cites to various recommendations made to RCSC in the 1987-2002 period related to roof and ventilation system issues in the pool area that RCSC did not implement as evidence that RCSC should have known of the presence of the degraded adhesive, the Court also cannot conclude that the trier of fact could legitimately infer from any of the cited-to evidence that RCSC possessed the requisite knowledge.  For example, Cincinnati Insurance relies on an August 1987 communication by Plummer Hasan & Associates Consulting Engineers to RCSC that stated that "[i]t is preferred that the beam should be sealed with waterproof sealant."[6]  Cincinnati Insurance's assertion that this recommendation was not implemented is based on the deposition testimony of RCSC's assistant general manager Wellman, who stated, after noting that he had never seen the document before, that he had not come across any documentation suggesting that the reused glulam beams were sealed with a waterproof sealant.  Cincinnati Insurance's statements of fact, however, do not

---

[6] Cincinnati Insurance's reply memorandum and its applicable statement of fact leave out the portion of the recommendation that states "it is preferred[.]"

refer to the actual communication as being part of the summary judgment record, do not cite to any evidence establishing who at RCSC received the communication, and do not cite to any evidence establishing that sealing the glulam beam would have prevented the adhesive in it from degrading.

Cincinnati Insurance also cites to some colorable evidence suggesting that RCSC had knowledge that some of the attic ventilation fans installed as part of the 1987 roof reconstruction may not have been working prior to the collapse. Even if this were true, a reasonable trier of fact could not conclude therefrom that RCSC had sufficient constructive knowledge of the presence of the degraded adhesive. First, while a December 2001 report from Starling & Associates, Inc., a civil and structural engineering company, stated that the roof structure would be in danger of moisture buildup that could cause a failure "similar to the previous occurrence" were the ventilation system to fail or be turned off, the previous occurrence being referred to involved corrosion and rot, not adhesive degradation. Second, Cincinnati Insurance's expert, Marc Sokol, testified at his deposition that while high humidity could have been a contributing cause of the failure of the glulam beam if the attic space had been unventilated, it would not have been sufficient by itself to cause a collapse. Third, there is not sufficient competent evidence of record from which a trier of fact could legitimately conclude that the attic space above the pool area was in fact unventilated.

The Court concludes that the only justifiable inference that the evidence of record permits is that the lay persons running RCSC at the applicable time had no knowledge prior to the collapse sufficient to invoke the "reasonably should have known" portion of the hidden defect coverage provision. This is shown, for example, by the uncontroverted evidence of record establishing (1) that the 1987

roof reconstruction was handled by a qualified architect and that RCSC complied with all requisite rules and regulations and acquired all necessary permits for the reconstruction, (2) that Marc Sokol, Cincinnati Insurance's engineering expert, stated in his report that the architect for the 1987 roof reconstruction had reused the glulam support beams because they had no visual signs of decay, and (3) that the December 2001 report from Starling & Associates, Inc. stated that an inspection of the roof structure in September 2001 found no evidence of significant structural distress that needed to be addressed prior to the remodeling of the pool area, including no evidence of significant moisture damage, lumber rotting or structural weakening in the main support beam, and that the forced air ventilation in the attic above the pool area had kept the attic dry as no evidence was seen of recent moisture or water damage to the structure.  Therefore,

IT IS ORDERED that Plaintiff's Motion for Partial Summary Judgment (doc. #23) is denied.

IT IS FURTHER ORDERED that Defendant/Counterclaimant RCSC's Cross-Motion for Summary Judgment on Coverage/Breach of Contract (doc. #75) is granted to the extent that the Court declares that the roof collapse at issue falls within the collapse coverage extension for hidden decay, as set forth in Section A.5(c)(2)(b) of Cincinnati Insurance Company's policy no. CPP 074 40 66.

IT IS FURTHER ORDERED that the First Claim (Hidden or Latent Defect), Second Claim (Negligent Work), and Third Claim (Collapse) of the Cincinnati Insurance Company's Complaint for Declaratory Judgment are dismissed.

DATED this 31st day of March, 2008.

Paul G. Rosenblatt
United States District Judge